IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EMILY J. STEIN-O'BRIEN,** | : | CIVIL ACTION |
| individually and p/n/g of | : | |
| **GENEVIEVE STEIN-O'BRIEN** | : | NO. 06-2101 |
| | : | |
| v. | : | |
| | : | |
| **THE PENNINGTON SCHOOL** | : | |

**MEMORANDUM AND ORDER**

**Kauffman, J.**                                                                                                           **January  14,  2008**

      Plaintiffs Genevieve Stein-O'Brien and her mother Emily Stein-O'Brien ("Plaintiffs") brought this action against The Pennington School ("Pennington" or "Defendant"), alleging violations of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a)(2), libel and slander, negligent and intentional infliction of emotional distress, and breach of contract.[1]  On March 21, 2007, the Court approved a stipulation dismissing with prejudice the Rehabilitation Act and negligent infliction of emotional distress claims.[2]  Now before the Court is Defendant's Motion for Summary Judgment (the "Motion") on the remaining claims.  For the reasons that follow, the Motion will be granted.

**I. BACKGROUND**

      Defendant is a private non-profit middle and upper school in Pennington, New Jersey.

---

    [1]      The Rehabilitation Act and libel and slander claims were brought on behalf of Plaintiff Genevieve Stein-O'Brien only.  The remaining claims were brought on behalf of both Plaintiffs.

    [2]      Although the only federal law claim in this action has been dismissed, the Court retains subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

1

See Defendant's Statement of Material Facts ("Def's Statement") ¶ 1.[3]  In addition to offering its regular curriculum, the school operates a Center for Learning (the "Center") for "students who have the intellectual ability to succeed in college but a learning difference significant enough to limit their achievement in a traditional academic setting."  Id. ¶¶ 3, 4.  The Center evaluates participating students at the beginning of each school year and develops an individualized education program ("IEP") "to address the areas in need of work and provide direction to the year."  Id. ¶ 6.  The Center also offers one-on-one instruction in a Communications Skills class ("CS class"), which meets daily and enables students to work with their CS teachers "to develop strategies for managing the academic material presented in other classes."  Id. ¶¶ 5, 7.

Plaintiff Genevieve Stein-O'Brien ("Genevieve") has been diagnosed with dyslexia and Attention Deficit Disorder-Hyperactive Type ("ADHD").  Id. ¶ 9.  She enrolled annually at Pennington for the academic years 1998-1999 through 2002-2003 (her 7th through 11th grade years).  See id. ¶¶ 2, 14.  Each academic year, Plaintiffs and Defendant entered into an Enrollment Contract.  See Mot. at Exh. BB.  Prior to enrolling at Pennington, Plaintiffs met with the Center's director, Jim Hodgson ("Hodgson"), regarding the accommodations Genevieve would receive in her regular curriculum classes to help her cope with her dyslexia and ADHD.  See Def's Statement ¶ 10.  Hodgson told Plaintiff Emily Stein-O'Brien ("Stein-O'Brien") that Genevieve would be evaluated every year and that he thereafter would meet with Stein-O'Brien to discuss the accommodations Genevieve should receive.  See id. ¶ 11.  Plaintiffs allege that Hodgson promised that Genevieve would receive three specific accommodations: (1) extended test-taking time; (2) a quiet testing area; and (3) clarification of test questions.  See Plaintiffs' Response to Defendant's Statement of Material Facts ("Pls' Resp. to Statement") ¶ 24.

---

[3]  Except where otherwise noted, all references to Defendant's Statement of Material Facts have been admitted by Plaintiffs.

From the 7th through 9th grades, Genevieve participated in the regular Pennington curriculum and also took an individualized CS class. Def's Statement ¶¶ 15, 19. Each year, an IEP was developed for Genevieve focusing on study and organizational skills, preparation for tests, and completion of long-term projects. Id. ¶¶ 16, 17; Pls' Resp. to Statement ¶ 16. In addition, Stein-O'Brien had weekly (or sometimes monthly) meetings with Hodgson regarding accommodations for Genevieve. See Def's Statement ¶ 12; Pls' Resp. to Statement ¶ 12. Plaintiffs had no complaints about Pennington or the accommodations Genevieve received during her 7th and 8th grade years. See id. ¶ 23; Deposition of Emily Stein-O'Brien ("Stein-O'Brien Dep.") at 20, attached to Plaintiffs' Response to Defendant's Motion for Summary Judgment ("Pls' Resp.") at Exh. B.

During Genevieve's 9th grade year, Stein-O'Brien began complaining that Genevieve was not always receiving accommodations in her classes, particularly her Geometry class taught by Louis Lavin ("Lavin"). See Def's Statement ¶¶ 39, 40. Stein-O'Brien met with Head of Upper School, Dr. William Hawkey ("Hawkey"), and other school personnel regarding the issues with Lavin. See id. ¶ 50; Pls' Resp. to Statement ¶ 50. Stein-O'Brien also complained about Genevieve's English class that school year. See Def's Statement ¶¶ 57-62. In addition, she became dissatisfied with Genevieve's CS teacher after concluding that the teacher had not taught Genevieve how to write, and "had taught her everything she possibly knew, and ... had not updated herself in a lot of new things that were happening." See id. ¶¶ 63, 64. Hodgson suggested assigning Genevieve to a different CS teacher, but Plaintiffs decided to hire a tutor rather than re-enroll Genevieve in the Center for her 10th grade year because they did not want to hurt the feelings of her current CS teacher. Id. ¶¶ 65, 66.

In Genevieve's 10th grade year, Plaintiffs had a dispute with the school regarding

3

Genevieve's ability to take an AP Chemistry class. However, after several meetings, Pennington allowed her to take the class despite concerns of the science department head, Mr. Horsley ("Horsley"), that she would not be able to understand the material. Id. ¶¶ 53-56.[4] Plaintiffs were also dissatisfied with Genevieve's English teacher that year because they felt he "did not understand [Genevieve's] writing style." See id. ¶¶ 73-75. However, she had no problems receiving accommodations such as extra time for tests, testing in a quiet environment, or receiving clarification of test questions during her 10th grade year. Id. ¶¶ 78.

During her 11th grade year (the 2002-2003 academic year), Genevieve's advisor, Melissa Kiser ("Kiser"), made sure that all of Genevieve's teachers knew that she needed accommodations and told Genevieve to let her know if she had any problems. See id. ¶¶ 90, 92.[5] Nonetheless, problems arose in her Trigonometry class taught by Lavin, as well as in her English class. Id. ¶¶ 88, 89. The parties agree that by the middle of Genevieve's 11th grade year, Stein-O'Brien's relationship with the school became "very difficult and even stormy." Id. ¶¶ 104.

On January 27, 2003, following a meeting between Stein-O'Brien and various school faculty and officials, the school's headmaster, Lyle Riggs ("Riggs"), sent Stein-O'Brien a letter that stated, in part:

> As we stated at the start of the meeting, it is essential that you allow us to do our jobs and that you learn to be supportive of us as we work with Genevieve. It is unacceptable for you to make false accusations against members of our community and for you to continue to speak about [Pennington] and its personnel in negative ways. If you remain unhappy with Pennington in spite of our

---

[4] Plaintiffs also claim that Horsley tried to keep Genevieve off the science league team because he thought she would not be able to compete at the rapid pace required of the competitions. However, she was allowed to try out, and she made the team second semester. Id. ¶¶ 80-82.

[5] Kiser also proctored several exams for which Genevieve required extra time. Id. ¶ 96.

> continued efforts to work with Genevieve, then it is imperative that
> you search for a school community that seems to meet with your
> expectations and requirements.

Id. ¶ 107; Motion at Exh. U. On February 26, 2003, Diane Monteleone ("Monteleone"), the Director of Admissions, sent the Stein-O'Briens a follow-up letter stating that the Admissions Committee at Pennington "has agreed that until and unless you can fully and honestly commit to [being supportive of Pennington, as outlined in the January 27th letter from Riggs,] and allow [Pennington] to work with Genevieve in ways that we believe appropriate, it would be neither in [Pennington's] nor Genevieve's best interests for her to return to Pennington. We will use the months during the second semester to ascertain from your actions what our final decision will be." Def's Statement ¶¶ 108, 109; Motion at Exh. V.

Plaintiffs thereafter visited several colleges during Genevieve's spring break, and, following a visit to Bryn Mawr, she applied for admission. See Def's Statement ¶ 110. On June 12, 2003, she was admitted to Bryn Mawr for the fall 2003 semester. Id. ¶ 111. On June 23, 2003, Stein-O'Brien advised Pennington that she was withdrawing Genevieve. Id. ¶ 112. Plaintiffs subsequently tried to persuade Pennington to allow Genevieve to graduate after her 11th grade year, but were unsuccessful. See id. ¶ 114. Instead, Genevieve obtained her GED in the summer of 2003, skipped her senior year of high school, and started Bryn Mawr in the fall without applying to other colleges. See id. ¶¶ 115, 133, 134. She graduated from Bryn Mawr in May 2007 after four years. Id. ¶ 121.

## II. LEGAL STANDARD

In deciding a motion for summary judgment pursuant to Fed. R. Civ. P. 56, the test is "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir.

1999) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must examine the evidence in the light most favorable to the non-moving party and resolve all reasonable inferences in that party's favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "there can be 'no genuine issue as to any material fact' . . . [where the non-moving party's] complete failure of proof concerning an essential element of [its] case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The party moving for summary judgment bears the initial burden of showing the basis for its motion. See Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). If the movant meets that burden, the onus then "shifts to the non-moving party to set forth specific facts showing the existence of [a genuine issue of material fact] for trial." Id.

## III. ANALYSIS

### A. Libel and Slander

Defendant contends that Genevieve's libel and slander claim must be dismissed because it is barred by the applicable statute of limitations. See Defendant's Memorandum in Support of Motion for Summary Judgment ("Def's Mem.") at 19. Under New Jersey law, the statute of limitations for libel and slander is one year.[6] See N.J.S.A. § 2A:14-3 ("Every action at law for libel or slander shall be commenced within 1 year next after the publication of the alleged libel or slander."). However, since Genevieve was a minor when the allegedly libelous statements were

---

[6] The parties agree that New Jersey law applies to the libel and slander claim. See, e.g., F.D.I.C. v. Bathgate, 27 F.3d 850, 871 n.12 (3d Cir. 1994) (applying New Jersey law to libel and slander claims because the parties "briefed the claims under New Jersey law, and no party asserts that federal law or the law of another state is applicable").

made,[7] the statute of limitations was tolled until she reached the age of maturity, which in New Jersey is the age of eighteen.  See N.J.S.A. § 2A:14-21; N.J.S.A. § 9:17B-1; see also Phillips v. Gelpke, 921 A.2d 1067, 1076 n.4 (N.J. 2007) ("minor's [tort-based] cause of action does not accrue until he or she reaches the age of eighteen" (citing N.J.S.A. § 2A:14-21)).

Genevieve became eighteen on May 19, 2004.  See Def's Statement ¶ 123.  Therefore, she had until May 19, 2005, one year after her eighteenth birthday, to file her claim for libel and slander.  Since the Complaint in the instant action was not filed until May 18, 2006, her claim was filed after the expiration of the applicable statute of limitations.  Accordingly, the libel and slander claim is time-barred and will be dismissed.

      B.      **Intentional Infliction of Emotional Distress**

Citing New Jersey law, Defendant argues that summary judgment should be granted on Genevieve's claim for intentional infliction of emotional distress because she has failed to provide evidence that Defendant's actions constituted the type of extreme and outrageous conduct that would support such a claim.[8]  Citing Pennsylvania law, Plaintiffs respond that there are genuine issues of material fact with respect to Genvieve's claim because she suffered emotional problems and sought counseling as a result of her experiences at Pennington.  See Pls' Resp. at 2-3.

New Jersey and Pennsylvania law on intentional infliction of emotional distress are generally in accord since both states subscribe to the Restatement definition: "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to

---

[7]    See Compl. ¶ 46 (claiming that Defendant's allegedly defamatory statements were made in 2003 when Genevieve was applying for admission to The Lawrenceville School).

[8]    Plaintiffs have agreed to withdraw Stein-O'Brien's claim for intentional infliction of emotional distress.  See Pls' Resp. at 2.

another is subject to liability for such emotional distress and, if bodily harm to the other results from it, for such bodily harm." Restatement (Second) of Torts § 46 (1965); see also Lohman v. Twp. of Oxford, 816 F. Supp. 1025, 1032 (E.D. Pa. 1993) (finding that both New Jersey and Pennsylvania "generally follow the Restatement definition of the tort of intentional infliction of emotional distress" (citations omitted)); Calkins v. Dollarland, Inc., 117 F. Supp. 2d 421, 431 (D.N.J. 2000) (same).

To succeed on an intentional infliction of emotional distress claim Genevieve must "establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Buckley v. Trenton Sav. Fund Soc'y, 544 A.2d 857, 863 (Pa. 1988) (applying New Jersey law). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Id. (quoting Restatement (Second) of Torts § 46 cmt d); Smith v. Twp. of East Greenwich, 2007 WL 3156258, at *13 (D.N.J. Oct. 30, 2007) ("The defendant's conduct must be regarded as atrocious, and utterly intolerable in a civilized community." (internal quotation marks and citation omitted)). In addition, the resulting emotional distress must be "so severe that no reasonable man could be expected to endure it." Buckley, 544 A.2d at 863 (quoting Restatement (Second) of Torts § 46 cmt j). "A severe and disabling mental or emotional condition which is capable of being generally recognized and diagnosed by professionals trained to do so qualifies as severe emotional distress." Smith, 2007 WL 3156258, at *14 (quoting Hill v. N.J. Dept. Of Corr., 776 A.2d 828 (N.J. Super. Ct. App. Div. 2001)). New Jersey courts often look for some evidence that the emotional distress has had a dramatic impact on a plaintiff's daily activities or ability to function. See, e.g., Buckley, 544 A.2d at 865; Turner v. Wong, 832 A.2d 340, 348 (N.J. Super. Ct. Law Div. 2003).

Plaintiffs have failed to show that Defendant's conduct was extreme or outrageous in nature or that Genevieve's emotional distress is severe enough to support a claim for intentional infliction of emotional distress under New Jersey law. At most, the school employed teachers whose teaching styles were unsatisfactory to Plaintiffs, and beginning in Genevieve's 9th grade year, failed to provide consistently the accommodations Plaintiffs requested. However, despite their complaints, Plaintiffs were satisfied enough with the school's performance to re-enroll Genevieve following her 9th and 10th grade years. See Stein-O'Brien Dep. at 106, 121. Moreover, disagreement over teaching styles and failure to provide accommodations does not rise to the level of conduct that is so atrocious as to shock the conscience or "utterly intolerable in a civilized society."

Although Plaintiffs allege that Genevieve became "paralyzed with fear to hand in her homework" and sought some psychological counseling while she was at Bryn Mawr, see Pls' Resp. at 3, at her deposition, she described her current mental health as "pretty good." Deposition of Genevieve Stein-O'Brien ("Genevieve Dep.") at 205, attached to Pls' Resp. at Exh. A. In addition, her accomplishments at Pennington – multiple AP or honors classes each year, A and B range grades in her classes, participation in numerous extracurricular activities, dean's list and national merit scholarship recognitions, and a 1500 on her SATs – belie the claim that her emotional distress was so severe that it was unbearable or had a dramatic impact on her ability to function. See Def's Statement ¶¶ 38, 69, 70, 83-85, 98-103.[9] Moreover, the psychologist Genevieve saw while at Bryn Mawr provided no diagnosis, she is no longer receiving treatment for mental or emotional problems, and at the time of her deposition, she had

---

[9] Similarly, after skipping her senior year of high school at Pennington, she graduated from Bryn Mawr in four years with an overall grade point average of 3.1, with a 3.6 in her major. Id. ¶ 121.

no plans to seek further counseling. See Genevieve Dep. at 199-204. Thus, there is insufficient evidence under either Pennsylvania or New Jersey law to support a claim for intentional infliction of emotional distress, and summary judgment will be granted on that claim.

    **C.    Breach of Contract**

        **1.    Choice of Law**

Since a federal district court sitting in diversity must apply the choice of law rules of the forum state, Pennsylvania's choice of law principles govern this dispute.[10] Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Pennsylvania courts look to the Restatement (Second) of Conflicts of Laws to resolve choice of law disputes in contract cases. See, e.g., Crabtree v. Academy Life Ins. Co., 878 F. Supp. 727, 730 (E.D. Pa. 1995) (citations omitted); Lindenbaum v. 1928 Co., 1989 WL 17554, at *1 (E.D. Pa. March 1, 1989). Section 188 of the Restatement provides that in contract actions, "[t]he rights and duties of the parties ... are determined by the local law of the state ... which ... has the most significant relationship to the parties." Restatement (Second) of Conflicts of Laws § 188(1). Section 188 also lists other important factors to be considered such as the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties. Id. § 188(2). Section 196 of the Restatement, which applies to service contracts, further adds that the applicable substantive law is the law of the state "where the contract requires that the services, or a major portion of the services, be rendered." Id. § 196.

---

[10] Defendant argues that New Jersey law applies to the breach of contract claim. See Defendant's Reply Brief in Support of Motion for Summary Judgment ("Def's Reply") at 4 n.2. Plaintiffs argue that Pennsylvania law is similar to New Jersey law and cite law from both states. See Pls' Resp. at 1-9.

10

In the instant case, Plaintiffs are citizens of Pennsylvania and contend that they signed the annual enrollment contracts with Pennington in Pennsylvania. However, "[s]tanding alone the place of contracting is a relatively insignificant factor." Lindenbaum, 1989 WL 17554, at *2 n.4. Pennington is located in New Jersey, and the educational instruction at the very core of this action was performed in New Jersey. More specifically, Genevieve attended all of her classes including her CS class in New Jersey, any accommodations she received occurred in New Jersey, and all meetings between the school and Stein-O'Brien took place in New Jersey. Moreover, as Defendant has argued, New Jersey has a strong interest in regulating the educational institutions located within its borders. Weighing the above factors, the Court finds that New Jersey has the most significant relationship to the contract between the parties and will apply New Jersey substantive law to Plaintiffs' breach of contract claim.

### 2. Breach of Contract for Educational Services

In their Complaint, Plaintiffs allege that Defendant "breached [its] contract with the Plaintiffs to provide educational services to the best of Genevieve's potential with accommodations for her learning disabilities." Compl. ¶ 52. When considering breach of contract claims based on inadequate or ineffective educational services (rather than claims based on breach of an express contractual provision), New Jersey courts have noted that such claims are comparable to a tort claim for educational malpractice. See, e.g., Swidryk v. Saint Michael's Med. Ctr., 493 A.2d 641, 642 (N.J. Super. Ct. Law Div. 1985) (noting that is it "mere characterization" to label such a claim as a breach of contract rather than a tort).[11] However,

---

[11] The Swidryk court noted that although many cases alleging educational malpractice have arisen in the context of public education, "[t]he same rationale for precluding a cause of action for educational malpractice has also been found to apply when the defendant is a private school." Swidryk, 493 A.2d at 643 (citation omitted).

11

"[e]ducational malpractice has not been approved as a theory of recovery in [New Jersey] or elsewhere." Myers v. Medford Lakes Bd. of Educ., 489 A.2d 1240, 1241 (N.J. Super. Ct. App. Div. 1985) (citing case law from other jurisdictions); see also Swidryk, 493 A.2d at 642 ("[T]here is no cause of action for educational malpractice either on a tort or contract theory.").[12] Courts outside of New Jersey explicitly have refused to create a cause of action for educational malpractice in cases in which the plaintiff alleges that he or she did not acquire basic academic skills. See Swidryk, 493 A.2d at 643 (citing Peter W. v. San Francisco Unified Sch. Dist., 60 Cal. App. 3d 814 (Ca. 1976); Donohue v. Copiague Union Free Sch. Dist., 391 N.E. 2d 1352 (N.Y. 1979)). Thus, to the extent Plaintiffs premise their breach of contract claim on a general theory that Defendant failed to provide adequate or effective educational services to Genevieve, the claim must be dismissed.

However, in addition to their general claim that Defendant failed to provide Genevieve with adequate educational services, Plaintiffs also claim that Defendant engaged in conduct that constitutes breaches of specific contractual promises. Plaintiffs allege that Defendant: (1) failed to teach Genevieve the skills necessary to deal with her dyslexia and ADHD in her 7th through 9th grade CS classes; (2) did not provide Genevieve with accommodations absent constant requests

---

[12] Cf., e.g., Christensen v. S. Normal Sch., 88 F. Supp. 2d 1306, 1309 (M.D. Ala. 2000) (citing cases from other jurisdictions and concluding that "the vast majority of courts have rejected claims attacking the general quality of education services provided to students"); Gally v. Columbia Univ., 22 F. Supp. 2d 199, 206-07 (S.D.N.Y. 1998) ("Where the essence of the complaint is that the school breached its agreement by failing to provide an effective education, the complaint must be dismissed as an impermissible attempt to avoid the rule that there is no claim in New York for 'educational malpractice.' Moreover, claims that sound in tort and ask the Court to involve itself in the subjective professional judgments of trained educators will not survive a motion to dismiss merely because the plaintiff couches her claims in terms of breach of contract." (internal citations omitted)); Caveliere v. Duff's Bus. Inst., 605 A.2d 397, 404 (Pa. Super. Ct. 1992) ("The difficulty with the instant lawsuit is simply that plaintiffs' complaint amounts to a general allegation of a lack of a quality education, without more.").

from Plaintiffs; (3) made Genevieve's re-enrollment offer for her 12th grade year contingent; (4) offered Genevieve an AP-level physics class her 11th grade year, but then dropped it down to an honors-level class midway through the year; and (5) breached the duty of good faith and fair dealing in fulfilling the terms of the contract.  See Pls' Resp. at 4-5.

### i.      Genevieve's CS Class

Plaintiffs contend that Defendant breached the parties' contract by failing to teach Genevieve writing and study skills in her CS class to address her dyslexia and ADHD.  See Pls' Resp. at 4.  This claim, however, is similar to Plaintiffs' general claim that Defendant failed to provide effective educational services, particularly since Plaintiffs do not point to a specific contractual promise that Defendant breached.  Therefore, the allegation is akin to an educational malpractice claim and must be dismissed.

### ii.     Plaintiffs' Requests for Accommodations

Plaintiffs also contend that Defendant's alleged failure to provide Genevieve with specific accommodations, such as extended test-taking time, quiet testing areas, and clarification of test questions, without constant requests and complaints constitutes a breach of the parties' contract.  Stein-O'Brien conceded at her deposition that neither the Enrollment Contracts entered each academic year nor the school catalogue mentioned specific accommodations that would be guaranteed for Genevieve, or more generally, for students with learning disabilities.  See Stein-O'Brien Dep. at 93-94.[13]  Moreover, although Plaintiffs claim that they were promised three

---

[13]      Plaintiffs have attached to their Response select portions of Defendant's 1997-1998 Course Catalogue and what appears to be part of a brochure about the Center.  See Exhs. D, E, attached to Pls' Resp.  Neither of these excerpts mentions accommodations.  Defendant has attached to its Motion a different portion of the Center brochure that *does* mention accommodations, but simply states that the Center's objectives are to "help the student participate in the school's academic curriculum at a level consistent with his or her intelligence"

specific accommodations by the school, Stein-O'Brien testified that Hodgson told her that Genevieve "would receive the accommodations she needed," but that she would be re-evaluated every year and the issue of specific accommodations would be discussed after those evaluations. See id. at 88-90. Although some of Genevieve's IEPs mention accommodations,[14] the IEPs were educational plans and were not contractual in nature. Without evidence of express contractual promises regarding specific accommodations, Plaintiffs' complaints regarding what accommodations Genevieve should have received and whether she received them are complaints regarding the educational services provided by Defendant. Therefore, these complaints also are the equivalent of an educational malpractice claim and will be dismissed.

### iii.   Defendant's Contingent Re-enrollment Offer

Without any citations to the record, Plaintiffs allege that Defendant breached the parties' contract by offering to renew Genevieve's enrollment only if: (1) Plaintiffs agreed to no longer complain about Defendant's failure to provide accommodations, and (2) Genevieve would not seek to take AP courses in English and Math. See Pls' Resp. at 4-5.[15] Assuming *arguendo* that Defendant did place these conditions on Genevieve's re-enrollment, Stein-O'Brien conceded that her relationship with the school had become "very difficult and even stormy" by the middle of

---

through "individually tailored academic supports and accommodations." Exh. H, attached to Motion.

[14]   For example, the IEPs for Genevieve's 8th and 9th grade years list "Provide time for Genevieve to finish tests if necessary" and "Provide additional time for testing" under the "testing" portion of the IEP section entitled "Support and Intervention." See Motion at Exhs. L, N.

[15]   The January 27, 2003 and February 26, 2003 letters do not mention either of these contingencies as conditions to Genevieve's re-enrollment. See Motion at Exh. U, V. Plaintiffs have not pointed to any other evidence in the record that the school made Genevieve's re-enrollment contingent on these specific conditions.

Genevieve's 11th grade year. Id. ¶ 104. The Enrollment Contract for Genevieve's 11th grade year expressly provides that "the School reserves the right not to continue enrollment or not to reenroll a student if the School reasonably concludes that the actions of a parent (or guardian) makes [sic] such a positive and constructive relationship impossible or otherwise seriously interfere with the School's accomplishment of its educational purposes." Motion at Exh. BB. Although New Jersey courts have noted that courts should not always rigidly apply contract principles to the relationship between students and schools, they have, in many cases, upheld express provisions of contracts entered into with private schools. See Princeton Montessori Sch. v. Leff, 591 A.2d 685, 687 (N.J. Super. Ct. App. Div. 1991) (upholding express contract provision regarding tuition payments); see also Beukas v. Bd. of Tr. of Fairleigh Dickinson Univ., 605 A.2d 708, 708-09 (N.J. Super. Ct. App. Div. 1992) (stating that if the university's various bulletins constituted an enforceable contract, they included a reservation of rights to discontinue academic programs; therefore, the university did not breach any contract when it discontinued its dental program). Accordingly, Plaintiffs have failed to set forth a genuine issue of material fact with respect to Genevieve's re-enrollment process at the end of her 11th grade year.[16]

---

[16]   Those New Jersey courts that have not rigidly applied contract principles to the relationship between students and schools have relied on quasi-contractual theory to resolve disputes. However, even were this Court to find that the application of quasi-contractual principles to this allegation were appropriate, the result would be the same. In Mittra v. Univ. of Med. and Dentistry of N.J., the New Jersey Superior Court Appellate Division upheld prior decisions "rejecting the rigid application of contract principles to university-student conflicts involving academic performance and limiting [the] scope of review to a determination whether the procedures followed were in accordance with the institution's rules and regulations." Mittra, 719 A.2d 693, 697 (N.J. Super. Ct. App. Div. 1998) (noting that the court previously held that "the courts may intervene where the institution violates in some substantial way its rules and regulations pertaining to student dismissals" (citing Napolitano v. Trs. of Princeton Univ., 719 A.2d 693 (N.J. Super. Ct. App. Div. 1982)).
   Although the instant case does not deal with an academic dismissal, the same principles are relevant. After Stein-O'Brien's relationship with the school deteriorated, the school notified

15

#### iv.     Genevieve's 11th Grade Physics Class

Plaintiffs next allege that Defendant breached the parties' contract by offering Genevieve an AP-level Physics course during her 11th grade year, but then dropping the course down to an honors-level class midway through the academic year because the teacher was not covering the material required for an AP course.  See Pls' Resp. at 3.[17]  Genevieve's 11th grade Enrollment Contract specifically provides that "[g]rade and classroom placement is determined by the School and does not constitute a part of this contract or its subsequent renewals."  Motion at Exh. BB.  Therefore, the Enrollment Contract does not guarantee Genevieve the right to take specific classes (such as AP Physics).  Moreover, Plaintiffs have not pointed to evidence of any other promises by Defendant that might create a contractual right on the part of Genevieve to take a specific course such as AP Physics.[18]  Accordingly, Plaintiffs have failed to create a genuine

---

Plaintiffs of the possibility that Genevieve would not be re-enrolled.  See Motion at Exhs. U, V.  There is no evidence that this procedure violated the school's rules and regulations for re-enrollment decisions.  See Deposition of Diane Monteleone at 14, attached to Pls' Resp. at Exh. L (identifying the February 26, 2003 letter as a "June hold," a type of letter used by the school to inform a family that the school is "going to wait until June to make a decision on whether the child will be asked to return").  Accordingly, regardless of whether the Court applies rigid contract theory or quasi-contractual principles, summary judgment is appropriate.

[17]     One court considering a legal challenge based on the failure of a student to obtain academic skills rejected such a claim in part because "different but acceptable scientific methods of academic training [make] it unfeasible to formulate a standard by which to judge the conduct of those delivering the services."  Swidryk, 493 A.2d at 643 (discussing Peter W. v. San Francisco Unified Sch. Dist., 60 Cal. App. 3d 814 (Ca. 1976)).  Courts in New Jersey have made it clear that judges should not "interfere with purely academic decisions" of a school.  Swidryk, 493 A.2d at 644; see also Napolitano, 453 A.2d at 273 ("Courts have also recognized the necessity for independence of a [school] in dealing with the academic failures, transgressions or problems of a student.").

[18]     In somewhat analogous circumstances, New Jersey courts have refused to recognize breach of contract claims in cases in which a school has reserved its right to discontinue or eliminate particular academic courses or programs.  See Gourdine v. Felician Coll., 2006 WL 2346278, at *4-5 (N.J. Super. Ct. App. Div. 2006) (finding that one optimistic comment by the dean regarding the future of the school's nursing program did not create a genuine issue of material fact where the school offered financial reasons for ending its nursing

issue of material fact regarding this alleged contractual breach.

### v. Breach of the Duty of Good Faith and Fair Dealing

Finally, Plaintiffs contend that Defendant breached its duty to act in good faith and deal fairly in fulfilling the terms of the parties' contract. See Pls' Resp. at 5. Every contract in New Jersey contains an implied covenant of good faith and fair dealing. See, e.g., R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 773 A.2d 1132, 1145 (N.J. 2001) (citations omitted). However, Plaintiffs did not raise this claim in their Complaint, and in fact, raised it for the first time in their Response to Defendant's Motion. Accordingly, the claim is not properly before the Court. See Avatar Bus. Connection, Inc. v. Uni-Marts, Inc., 2005 WL 3588482, at *14 (D.N.J. 2005) (dismissing a breach of covenant of good faith and fair dealing claim where it was not asserted in the complaint and had not been "injected into the case prior to Plaintiff's filing his brief in opposition to Defendant's summary judgment motion").[19]

## IV. CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment will be granted. An appropriate Order follows.

---

program and the comment by the dean could not be considered a contractual promise); see also Beukas v. Bd. of Trs. of Fairleigh Dickinson Univ., 605 A.2d 776, 782-83 (N.J. Super. Ct. Law Div. 1991) (finding that the university's bulletin reserved the right to eliminate any college within the university subject only to giving academic notice to the students). Although Pennington has not offered evidence that it reserved its right to eliminate courses or academic programs, the school did reserve its right to determine class placement.

[19] Even assuming Plaintiffs had raised this claim previously, a general claim that Defendant breached the covenant of good faith and fair dealing by failing to provide educational services would be the equivalent of a claim for educational malpractice, which, as the Court has stated, has not been recognized as a cognizable claim by New Jersey courts.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EMILY J. STEIN-O'BRIEN,** | : | **CIVIL ACTION** |
| individually and p/n/g of | : | |
| **GENEVIEVE STEIN-O'BRIEN** | : | NO. 06-2101 |
| v. | : | |
| **THE PENNINGTON SCHOOL** | : | |

## ORDER

**AND NOW**, this 14th day of January, 2008, upon consideration of Defendant's Motion for Summary Judgment (docket nos. 22-29), Plaintiff's Response thereto (docket no. 32), and Defendant's Reply (docket nos. 33-37), and for the reasons stated in the accompanying Memorandum, it is **ORDERED** that the Motion is **GRANTED**. Accordingly, the Clerk of the Court shall mark this case **CLOSED**.

BY THE COURT:

/s/ Bruce W. Kauffman

BRUCE W. KAUFFMAN, J.